# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DISTRICT

**TIMOTHY HOGAN**                                                      **PLAINTIFF**

**VS.**                               **CIVIL ACTION NO.**   **3:25-cv-707-KHJ-MTP**

**MANAGEMENT & TRAINING CORPORATION**
**AND JOHN AND JANE DOES 1-100**                                **DEFENDANTS**

## COMPLAINT

*Jury Trial Demanded*

1. This Complaint is brought by Timothy Hogan (hereinafter collectively as "Plaintiff") by and through the undersigned counsel against Management and Training Corporation, and John and Jane Does 1-100. In support, therefore, Plaintiff states as follows:

## JURISDICTION AND VENUE

2. This cause of action arises under the United States Constitution, as well as the Civil Rights Act, 42 U.S.C. § 1983. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, § 1332, and § 1343. The Court also has pendent jurisdiction over the Plaintiff's state causes of action.

3. Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because the events complained of occurred in this judicial district and division.

## PARTIES

4. Plaintiff Timothy Hogan (hereinafter "Hogan") is an adult resident citizen of Mississippi who, at all times relevant, was incarcerated at East Mississippi Correctional Facility ("EMCF") in Lauderdale County, Mississippi. Substantial acts, omissions, and events that caused Plaintiff Hogan's injuries occurred in Lauderdale County, Mississippi.

5. Defendant, Management and Training Corporation (hereinafter, "MTC"), a

1

national for-profit prison operator incorporated existing in the state of Utah, was given a contract by the Mississippi Department of Corrections ("MDOC") in April, 2012 for the management and oversight of the prisons daily operations, which it has the responsibility for providing humane care and treatment consistent with all constitutional and ACA standards. MTC's 5,545-employee corrections division operates twenty-four (24) correctional facilities throughout the United States, with seventeen (17) contracts with state correctional departments and seven (7) with federal correction agencies. The acts, omissions, and events that gave rise to Plaintiff's complaint occurred under MTC's management. MTC principal place of business is located at 500 N Marketplace, Drive, Centerville, Utah 84014, and is subject to the personam jurisdiction of the Court by service of process upon is appointed registered agent, CT Corporation System, located at 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

6.     Plaintiff is ignorant about the identities of Defendant John and Jane Does 1-100, unknown officers, employees, agents, and or servants of MTC. Plaintiff will amend this Complaint to allege their proper names and allege that each of the fictitiously named Doe Defendants are responsible in some manner for the occurrences herein alleged, and Hogan's damages, as alleged herein, were proximately caused by their conduct. Upon information and belief, Plaintiff asserts that the Doe Defendants were the officers, agents, servants, and employees of Defendant and were at all times acting under color of law with the permission and consent of Defendant within the course and scope of their employment.

## FACTS

### *Gang Violence and Deliberate Indifference at EMCF*

7.     Defendant Management and Training Corporation ("MTC") is a private, for-profit corporation responsible for managing and operating correctional facilities across the United States.

In Mississippi, MTC currently manages two facilities: East Mississippi Correctional Facility ("EMCF") located in Meridian, Mississippi, with a capacity of approximately 1,500 inmates. MTC assumed management of EMCF in 2012.

8. MTC earns more than $525 million annually from its prison operations. EMCF has long-standing, well-documented history of gang violence, staff corruption, inadequate supervision, and inhumane living conditions.

9. For years prior to the attacks referenced in this complaint, MTC had actual knowledge that EMCF was plagued by gang violence, drug trafficking, contraband, and assaults. Gangs control nearly every aspect of prison life, including where inmates sleep, eat, and access basic services, through violence and extortion. Inmates are forced to pay debts through food, labor, smuggling, or online cash equivalents such as Green Dot cards.

10. In a federal lawsuit, former EMCF Warden Frank Shaw testified that he could not guarantee the prison could perform its most basic function of keeping inmates safe. Surveillance video has shown officers taking as long as 30 minutes to respond to active assaults, during which inmates are left to bleed out in their cells or common areas.

11. MTC officials and staff have consistently ignored, tolerated, and in some cases participated in the corrupt environment that allows this violence. Employees have been known to smuggle in weapons and contraband, accept payments from gang leaders, and grant favored inmates—especially those linked to gangs—special privileges like unrestricted movement and cell access.

12. MTC frequently hires unqualified correctional officers who lack the training, judgment, and ethical standards necessary to safely supervise inmates. Many of these officers participate in or enable illegal activity, including smuggling drugs and weapons into the facility

and maintaining sexual relationships with gang-affiliated inmates.

13. Gang members often identify and target young women without criminal records on social media platforms like Facebook, encouraging them to apply for officer positions at EMCF. Once hired, these officers are groomed or manipulated into assisting gang operations by smuggling contraband, ignoring assaults, and granting gang members unauthorized access to housing units and rival inmates. This deliberate failure in hiring, screening, and supervising staff has created a culture of corruption and lawlessness that endangers all inmates and violates core standards of prison safety and constitutional care.

14. It is well documented that cell doors across EMCF can be easily "rigged" or simply malfunction, allowing inmates to roam freely. This failure in physical security allows attackers to target vulnerable inmates, including those who report threats or attempt to disaffiliate from gang activity.

15. Numerous reports indicate that MTC staff at EMCF, including supervisory officers, routinely engage in sexual and coercive relationships with gang members. These gang members then use those relationships to gain access to rival inmates, control contraband distribution, and avoid disciplinary actions.

16. In the case of Bobbie Jenkins and Steven Buckley, both were housed in EMCF in November 2021 when Vice Lord gang members brutally stabbed them. Jenkins died of his wounds. Despite Jenkins having reported concerns about gang favoritism by staff, no preventative action was taken. The attackers gained entry to the cells because the locks were inoperable, a common condition at the facility. (See *Buckley v. MTC*, Case No. 5:22-cv-26-DCB-FKB, S.D. Miss.).

17. Buckley and Jenkins were stabbed with free-world items, including a box cutter, ice pick, knife, and prison-made shanks. An officer was later arrested and charged with her

involvement in this incident. Correctional officers laughed at them and delayed medical attention for nearly two hours. This pattern mirrors the mistreatment of Mr. Hogan, reinforcing that the conditions at EMCF are not isolated but systemic and ignored by MTC leadership.

18. Despite knowledge of weapons proliferation and gang movement, MTC conducted few, if any, targeted shakedowns, citing staffing shortages. Even when weapons were found, reports were ignored or altered. Employees were rarely disciplined, and prison policy against giving job duties to Security Threat Groups was regularly violated.

19. In *Jackson v. Wilkinson County*, Case No. 5:22-cv-00029-DCB-LGI, the plaintiff brought claims for failure to protect and constitutional violations stemming from similar inadequate staffing, gang activity, and deliberate indifference.

20. In *Russell v. MTC*, Case No. 3:22-cv-00294-HTW-LGI, Jeremy Russell was found dead in his EMCF cell in October 2021. The lawsuit alleged that MTC staff failed to prevent his suicide despite documented mental health risks and a history of self-harm, as well as MTC's role in fostering a facility culture rife with drug abuse and inadequate monitoring.

21. In *Marsh v. MTC*, Case No. 3:24-cv-00339-TSL-MTP, a plaintiff was brutally assaulted by gang members at EMCF due to MTC's failure to staff housing units, conduct proper counts, and prevent known threats. The complaint outlined a systemic history of undertraining, understaffing, and employee complicity.

22. In *Carthan v. MTC*, Case No. 3:25-cv-00163-CWR-ASH, a wrongful death claim was brought on behalf of Edward Boyd, who was murdered by gang members murdered in EMCF. At the same time, staff ignored repeated security risks and allowed free movement due to broken cell locks and a lack of supervision.

23. In *Rivers v. MTC*, Case No. 3:25-cv-156-CWR-LGI, the plaintiff was assaulted

twice in late 2023 by Vice Lords after renouncing gang affiliation. The complaint emphasized MTC's deliberate indifference, including repeated staff failure to intervene, document assaults, or reclassify inmates with known threats.

24. MTC's practice of ignoring threats, permitting known violent gang members to work in sensitive positions, and failing to intervene before, during, or after violent incidents demonstrates a custom of deliberate indifference and failure to protect inmates like Jenkins, Buckley, Russell, Boyd, Rivers, and Mr. Hogan.

### *MTC's Failure to Follow Security Procedures and Chronic Understaffing*

25. MTC, pursuant to its contract with the Mississippi Department of Corrections (MDOC), was required to implement policies and procedures for regular inmate counts, security rounds, and logbook documentation. These procedures—including certified counts at shift changes and hourly formal and informal counts—are critical to ensuring inmate safety. However, MTC staff routinely failed to perform these duties.

26. Officers failed to complete required rounds, document counts in logbooks, or submit count slips. This lack of accountability left zones unsupervised for extended periods and directly enabled gang assaults, such as those suffered by Mr. Hogan.

27. As documented in *Carthan v. MTC,* Case No. 3:25-cv-00163-CWR-ASH (S.D. Miss.), MTC's longstanding failure to maintain adequate staff levels and ensure compliance with security policies created a foreseeable risk of harm. Internal audits and expert testimony revealed that officers skipped rounds, opened cell doors for gang-affiliated inmates, and ignored assaults caught on surveillance footage. These failures were not isolated. They reflect a systemic pattern of MTC operating facilities with dangerously low staffing levels, employing poorly trained and easily compromised guards, and failing to protect inmates from known threats—all of which amount to

deliberate indifference under the Eighth and Fourteenth Amendments.

*Brutal Assaults on Hogan and Discovery of State Actor Involvement*

28. On September 9, 2022, while asleep in his cell at EMCF, Plaintiff Hogan was violently attacked and stabbed multiple times by three inmates. Hogan told EMCF medical staff that "three other inmates came into his cell and started stabbing him," and said a surgeon at Rush Health Hospital that he "was asleep when attacked in a robbery."

29. Hogan sustained multiple stab wounds to his back, torso, limbs, head, and face. EMCF medical staff documented wounds of varying depths, with possible lung penetration. Hospital staff identified lacerations to his face, scalp, and shoulder. A CT scan revealed a possible pneumothorax and air under the skin consistent with multiple penetrating wounds. Hogan required approximately 113 sutures to repair his injuries.

30. At the time of the September 9 assault, Hogan had no access to investigative reports, security footage, or internal information that would have revealed officer involvement. Staff deliberately concealed their role in orchestrating the attack, and Hogan reasonably believed the incident was solely the result of inmate violence.

31. Mr. Hogan exercised diligence in seeking accountability for the September 9, 2022, assault. He attempted to file grievances and report the incident, but correctional officers thwarted his efforts, refused him forms, and denied him information about any investigation.

32. It was not until on or about October 8, 2022, when he overheard gang members openly discussing that EMCF officers had ordered the September 9 assault, to "teach him a lesson" for allegedly being disrespectful toward staff, that Hogan could have reasonably discovered state actor participation. Only then did he have sufficient knowledge of facts to bring a claim under 42 U.S.C. § 1983." Before October 8, 2022, Hogan had no factual basis to bring a §1983 claim

because state actor involvement was concealed.

33. Shortly after learning of officer involvement, Hogan reported what he had learned to prison staff. Instead of protecting him or investigating, staff retaliated by targeting Hogan and charging him with a contraband rule violation on or about October 13, 2022. This retaliation further discouraged his ability to pursue remedies and demonstrated MTC's deliberate indifference.

34. On December 13, 2022, while housed in administrative segregation ("protective custody") at EMCF in Housing Unit 5C, Hogan was again attacked. Earlier that same day, Hogan refused a housing assignment and told a Mental Health Professional that he feared for his life and had informed security staff of his concerns, but nothing was done.

35. That evening, gang-affiliated "floor walkers"—inmates given unauthorized access by EMCF staff—pried open Hogan's segregation cell door and assaulted him with homemade knives and a wooden object. EMCF has a history of allowing "floor walkers" to enter segregation units and attack vulnerable inmates.

36. Hogan sustained multiple injuries, including a 7mm laceration near his mouth, puncture wounds, abrasions, hematomas, and numerous hand lacerations requiring 19 staples and 19 sutures. He reported numbness in his left arm and hand.

37. Despite Hogan's repeated safety concerns, MTC staff failed to prevent the December 13 assault.

38. These events occurred in the context of MTC's chronic failure to follow mandated security procedures. Like in *Carthan v. MTC*, Case No. 3:25-cv-00163-CWR-ASH, officers at EMCF routinely failed to complete required security rounds, submit count slips, or document their observations in logbooks. These failures allowed inmates to roam zones freely and commit violent assaults without fear of intervention.

39. These repeated assaults were not coincidental. They occurred within an institutional culture where basic security protocols were ignored, zones were left unmonitored, and MTC tolerated staff participation in gang activity. MTC's failure to hire and train competent officers, coupled with deliberate understaffing and systemic disregard for safety protocols, created the exact environment in which Mr. Hogan was attacked multiple times. These failures amount to deliberate indifference under the Eighth and Fourteenth Amendments.

*Unavailability of the Grievance Process*

40. After both the September 9 and December 13 assaults, Hogan attempted to file grievances. Correctional staff refused to provide forms, ignored his requests, and ensured no grievance submissions were processed or answered. The grievance process was effectively unavailable to Hogan, further demonstrating MTC's deliberate indifference.

41. Hogan was diligent in seeking to understand the cause of his September 9, 2022, injuries. Although he immediately knew he had been stabbed, he had no reason to believe state actors were involved because officers and staff concealed their role.

42. Approximately one month later, on or about October 8, 2022, Hogan overheard gang members state that EMCF officers had ordered the assault to punish him for alleged "disrespect."

43. After reporting this information to staff, Hogan was retaliated against by being targeted and charged with a contraband rule violation on or about October 13, 2022.

44. His claims, therefore, accrued only after he discovered officer involvement and experienced retaliation for reporting it. Before October 8, 2022, Hogan had no factual basis to bring a §1983 claim because state actor involvement was concealed.

### *MTC Deliberately Ignored the Known Risk of Harm to Mr. Hogan*

45. The September 9, 2022, assault was not a random inmate attack but one orchestrated by EMCF correctional officers, who directed gang-affiliated inmates to stab Mr. Hogan in retaliation for what they claimed was "disrespect." By ordering and facilitating this assault, officers themselves created the risk of harm and ensured Mr. Hogan's constitutional rights were violated.

46. On December 13, 2022, after Mr. Hogan explicitly expressed fear for his safety and refused housing because he was "in fear for [his] life," MTC staff failed to provide protection. Instead, while Hogan was housed in administrative segregation ("protective custody"), MTC employees allowed unauthorized inmates known as "floor walkers" access to his cell and zone, where they violently attacked him.

47. The September 9, 2022, incident occurred as a direct result of officers' own participation in orchestrating and directing the attack on Mr. Hogan. MTC was aware of longstanding officer corruption, including staff collusion with gangs and the use of inmates to retaliate against others, yet failed to take corrective action. Rather than addressing these systemic issues, MTC permitted its employees to continue enabling and participating in such assaults, resulting in the deliberate orchestration of the attack against Hogan.

48. The December 13, 2022, assault occurred because officers deliberately ignored Hogan's explicit pleas for protection and his warnings that he feared for his life. Instead of taking preventive action, MTC staff allowed unauthorized inmates—known as "floor walkers"—to gain access to Hogan's cell and zone while he was in administrative segregation. By ignoring his requests for help and allowing gang-affiliated inmates unauthorized entry into protective custody areas, MTC directly caused Hogan to suffer a second brutal assault.

49. Weapons such as those used to stab Mr. Hogan are readily available at EMCF due

to MTC's systemic failure to restrict contraband. Correctional officers themselves frequently smuggle in weapons and drugs or deliberately ignore when gang-affiliated inmates possess or use them. MTC has failed to implement or enforce effective policies to curtail the presence of weapons, even though the risk is widely recognized by staff and administrators.

50. MTC officials and staff at EMCF are fully aware of the prevalence of weapons and gang violence. Guards are routinely bribed or intimidated into ignoring violations. Some are paid by gang members to look the other way, while others remain silent out of fear. Despite knowing of this corruption, MTC has taken no meaningful steps to reduce it, leaving inmates like Mr. Hogan vulnerable to foreseeable and preventable assaults.

51. Upon information and belief, MTC failed to conduct consistent and effective security shakedowns at EMCF. When searches were performed, officers often ignored contraband or failed to report it—either because they were compromised or because MTC lacked proper supervision and accountability. These failures contributed directly to the assaults on Mr. Hogan, who suffered permanent and traumatic injuries.

52. MTC was severely understaffed at the time of each assault. This pattern of chronic understaffing at EMCF left entire zones unsupervised and unmonitored, enabling gang members to carry out assaults with impunity. The few staff on duty were often undertrained and unsupervised, and therefore incapable of effectively managing inmate safety in a volatile environment. These conditions were negligent, grossly negligent, and deliberately indifferent to the risk of harm faced by Mr. Hogan.

53. EMCF is plagued by inmate-on-inmate violence, and MTC continues to operate these facilities without sufficient staff or supervision. Inmates are routinely left to fend for themselves in unsupervised units, and many correctional officers lack the training to respond to threats or prevent

attacks. The assaults on Mr. Hogan were not only foreseeable but inevitable given these conditions.

54. MTC has been repeatedly sued for similar misconduct at EMCF. Cases such as *Buckley v. MTC, Rivers v. MTC, Marsh v. MTC, Jackson v. Wilkinson County,* and *Carthan v. MTC* highlight persistent failures in security, staffing, and oversight. These lawsuits, along with internal reports, grievances, and audits, placed MTC's policymakers on clear notice of the violent and corrupt environment at EMCF. Nevertheless, MTC refused to adopt or enforce the policies necessary to reduce the danger—demonstrating gross negligence, willful disregard, and deliberate indifference to the constitutional rights of inmates like Hogan.

## COUNT 1:
## § 1983 CAUSE OF ACTION:
## UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT, FAILURE TO TRAIN, SUPERVISE, STAFF, AND DISCIPLINE

55. Plaintiff incorporates all preceding allegations.

56. MTC is treated as a "municipality" for the purposes of complaints brought pursuant to 42 U.S.C. § 1983. MTC can be held liable for Hogan's injuries if there exists a custom or policy that caused a constitutional deprivation attributed to MTC's policymakers.

57. MTC's policymakers and John and Jane Doe Defendants 1-100, have established customs, policies, and practices which created unconstitutional conditions of confinement, Defendants MTC and John and Jane Doe Defendants 1-100 violated clearly established constitutional rights of the decedent, including but not limited to:

   a. Cruel and unusual punishment under the Eighth and Fourteenth Amendments;

   b. Hogan's right not to be deprived of liberty without due process of law;

   c. Hogan's right to be safe and protected from injuries while in Defendants' custody;

   d. Hogan's right to be protected by the prison officials and guards while under

their control; and

  e. Hogan's right to be free from excessive and unreasonable force.

58. As a direct and foreseeable result of Defendants' action, Hogan suffered a brutal attack, severe physical injuries, emotional distress, mental anguish, as well as pain and suffering.

59. Defendant MTC, by and through Doe Defendants 1-100 in their individual and official capacities, established customs, policies, and practices which directly and proximately caused the deprivation of Hogan's constitutional rights as alleged herein. Defendant and the Doe Defendants were deliberately indifferent to the safety of Hogan and other inmates at EMCF. These policies created unconstitutional conditions of confinement.

60. Such unwritten policies, customs and practices include but are not limited to the following:

  a. Inadequate and improper training, supervision and discipline of EMCF corrections officers;

  b. Inadequate and improper procedures and practices in screening hiring, training, supervising and disciplining officers who have improper relationships with inmates, specifically gang members and who routinely bring in contraband to those inmates creating a dangerous prison environment;

  c. In adequate and improper procedures, policies and practices for investigating improper activities by EMCF correctional officer either through offender complaints of misconduct or through internally-initiated complaints or investigations;

  d. Inadequate or improper procedures, policies and practices for identifying and

taking appropriate action against EMCF correctional officers, who are in need of re-training, corrective measure, reassignment, other non-disciplinary actions, through a positive or early warning system designed to prevent such conduct;

e. Failing to enforce policies and procedures with regards to the management and control of Security Threat Groups in violation of MDOC policy;

f. Failing to staff EMCF with trained and qualified guards adequately and allowing the prisons to be unstaffed, leading to an increase in inmate-on-inmate assaults and deaths;

g. Housing gang members with inmates who have renounced their gang affiliation;

h. Failing to follow policies and procedures to eliminate and/or control the flow of contraband, including but not limited to drugs and shanks, in the prison leading to an increase in inmate-on-inmate violence;

i. Failing to enforce the policy of requiring guards to make security rounds to check on inmates which also leads to an increase of inmate-on-inmate violence.

61. All the actions by MTC, its policy makers, and Doe Defendants 1-100 were done with deliberate indifference to the constitutional rights of EMCF inmates, specifically Hogan, and caused and/or contributed to Hogan's injuries.

## COUNT 2:

### § 1983 CAUSE OF ACTION
### RATIFICATION

62. Plaintiff incorporates all preceding allegations.

63. MTC, its policy makers, and Doe Defendants 1-100 were advised about the threats against Hogan and his fear for his safety. MTC, by and through its policy makers, ignored evidence of widespread disregard of policies and procedures intended for the protection of inmates including

Hogan and systemic deficiencies that violated his constitutional rights. Based on information and belief, not one officer, supervisor, or any other person was disciplined, considered for discipline, or even retrained on policies intended to protect inmates. Instead, the policymakers approved the actions of the correctional officers.

64. Through these acts and omissions of ratification, MTC's policymakers were deliberately indifferent to Hogan's constitutional rights as set forth herein. A plaintiff can establish a municipal liability claim by showing that a final municipal policymaker approved an investigation that was "so inadequate as to constitute a ratification" of the misconduct. *Wright v. City of Canton,* 138 F.Supp.2d 955, 966 (N.D. Ohio 2001). "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). An isolated decision by a municipal official that is not intended to control future decisions can nonetheless give rise to municipal liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480- 81 (1986). MTC ratified the actions of its employees; and is therefore liable for Hogan's injuries.

## COUNT 3:

### NEGLIGENCE/GROSS NEGLIGENCE

65. Plaintiff incorporates all preceding allegations.

66. At all times, relevant herein, defendants and their employees had a duty to exercise ordinary care for the inmates at EMCF, including Hogan. Defendants and their employees breached that duty by failing to use the ordinary care that a reasonable person will use to avoid and prevent injury to others, i.e. in the case sub judice, to protect Hogan from harm by other inmates reasonably. Defendants' breach of this duty led to the permanent damage sustained by the Plaintiff. This breach was so egregious as to amount to gross negligence.

67. The injuries sustained by Timothy Hogan were the reasonably foreseeable outcome of Defendants' and their employees' acts and omissions. These acts and/or omissions were the substantial factors in causing injuries to Timothy Hogan.

## COUNT 4:

### NEGLIGENT HIRING, TRAINING, AND SUPERVISION

68. Plaintiff incorporates all preceding allegations.

69. Defendant MTC and John and Jane Doe Defendants 1-100 are required by law to provide sufficient training to prison administrators and correctional officers to protect inmates from harm, ensure their safekeeping, and ensure their well-being.

70. Acting under color of law and under the official policy, custom, and/or practice, Defendant, by and through their policy makers for MTC/EMCF and John Doe Defendants 1-100, failed to hire, train and supervise correctional officers, administrators, and personnel sufficiently employed by MTC/EMCF to provide for the safety adequate, and well-being of inmates, like Hogan, while incarcerated at EMCF to control and/or reduce inmate-on-inmate violence.

71. Defendant MTC and John Doe Defendants 1-100 failed to hire, train, and supervise its staff to handle the violent prison population that exists at EMCF. As such, there have been numerous instances of violence against inmates, such as Hogan, resulting in multiple inmate deaths and assaults.

72. Despite MTC's knowledge of the atmosphere of violence existing at MTC and the staff corruption that causes or contributes to the harm of inmates such as Hogan, MTC's policymakers refuse to enforce policies and procedures to adequately train and supervise prison administrators and correctional officers to control and/or reduce inmate-on-inmate violence.

73. Thus, acting under the color of law and pursuant to official policy or custom, Defendant MTC and the John and Jane Doe Defendants 1-100 directly or indirectly approved,

acquiesced in, or otherwise participated in the acts or omissions which deprived Timothy Hogan of his civil and constitutional rights.

74. Defendant MTC and the John and Jane Doe Defendants 1-100's failure to properly train prison correctional officers, administrators, and personnel at EMCF resulted in the violation of Timothy Hogan's civil and constitutional rights and caused him to suffer injuries.

## COUNT 5:

### RESPONDEAT SUPERIOR/VICARIOUS LIABILITY

75. Plaintiff incorporates all preceding allegations.

76. Defendants MTC and other unknown EMCF correctional officers (Does 1-100) acted with negligence, gross negligence, and/or intentionally allowed or failed to prevent the attack on Hogan. At all times relevant, each Defendant owed a duty to Plaintiff to ensure his safety, and the Defendants breached that duty. The actions and inactions of Defendant MTC and/or other EMCF correctional officers led directly to the injuries suffered by the Plaintiff. Defendant MTC, as Defendant John and Jane Does 1-100's employer, is liable for their actions which were undertaken during the course and scope of their employment with Defendant MTC.

77. Defendant MTC is also responsible for the actions and/or inactions alleged herein against Defendants John and Jane Does 1-100, which caused the damages suffered by the Plaintiff. Such actions and/or inactions by said individual Defendants were committed within the course and scope of their employment with Defendant MTC.

## COUNT 6:

### PUNITIVE DAMAGES

78. Plaintiff incorporates all preceding allegations.

79. The Defendants have acted in complete disregard for the safety of the Plaintiff by

acting in a grossly negligent manner as previously described herein. The actions of the Defendants warrant punitive damages.

80. The Defendants' actions exhibit gross negligence and direct disregard of the safety of the Plaintiff. Punitive damages should be awarded against the Defendants. Defendants' tortuous actions have caused bodily injuries, emotional distress, and mental anguish.

## PRAYER FOR RELIEF

81. Plaintiff Timothy Hogan respectfully prays for the following relief:

    a. Actual and general compensatory damages of, from and against the Defendants, in an amount to be determined by this Court;

    b. Punitive damages of, from, and against the Defendants and John Doe Defendants 1-100, in an amount to be determined by this Court;

    c. Reasonable attorney's fees and all costs of this Court;

    d. Pre and post judgment interest; and

    e. Such other general and specific relief as appears reasonable and just in this cause.

RESPECTFULLY SUBMITTED, this 18th day of September, 2025.

**TIMOTHY HOGAN**

By: /s/ LaToya T. Jeter
LATOYA T. JETER
*Attorney for Plaintiff*

OF COUNSEL:

LaToya T. Jeter (MSB NO. 102213)
BROWN BASS & JETER, PLLC
Post Office Box 22969 Jackson, Mississippi 39225
Telephone: (601) 487-8448
Facsimile:  (601) 510-9934
Email: jeter@bbjlawyers.com